**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

In re:

RAILHEAD, INC.,

Debtor.

Case No. 26-10508-BFK
Chapter 11

**MEMORANDUM OPINION AND ORDER:**
**(1) DISMISSING CASE SUA SPONTE; AND**
**(2) DENYING EMERGENCY MOTION**
**OF REPUBLIC CAPITAL ACCESS, LLC, TO**
**APPOINT CHAPTER 11 TRUSTEE AS MOOT**

This matter came before the Court on the Emergency Motion of Republic Capital Access, LLC ("RCA"), for the appointment of a Chapter 11 Trustee. Docket No. 57. The Debtor. Railhead, Inc. ("Railhead," or "the Debtor"), filed an Opposition to the Motion. Docket No. 66. RCA filed a Reply Memorandum. Docket No. 67. The Court heard the evidence and the parties' arguments on May 15, 2026. For the reasons stated below the Court will: (1) dismiss this case *sua sponte*; and (2) deny RCA's Motion as moot.

### FINDINGS OF FACT

The Court, having heard the evidence, makes the following findings of fact.

*A.  RCA and the Debtor's Relationship.*

1.      Railhead is a government subcontractor, working for prime contractors in the national security field. It had gross revenue in 2025 of $5.7 million. Docket No. 33, p. 17. It had gross revenue in 2024 of $5.2 million. *Id*.

1

2.      RCA is a factor. It is not a secured lender. It purchases invoices, and did so in this case. The primary agreement between RCA and Railhead is an Accounts Receivable Purchase Agreement ("ARPA"), dated as of September 13, 2018. RCA Ex. 4.[1]

3.      Under the terms of the ARPA, RCA would pay 85% of the face amount of an invoice to Railhead. ARPA § 2.3.1.

4.      Initially, Railhead had a Facility Limit of $100,000.00 with RCA. *Id*. at § 2.2.

5.      Over time, the Facility Limit was increased. In June 2025, the parties entered into a Third Amendment to the ARPA, under which the Facility Limit was increased to $1,000,000.00. RCA Ex. 6, § 1.1.

6.      The Third Amendment also contained a "no material adverse change" clause (commonly known as a "MAC" clause). *Id*. at § 2.4.

7.      Railhead had a contract with the Department of State that was terminated before the execution of the Third Amendment. RCA maintains that this was a material breach of the MAC clause (though, the Department of State contract was not one that RCA purchased).

8.      On August 12, 2025, Jason Butler, Railhead's CEO, emailed Matt Stavish, RCA's Senior Vice President, and advised Mr. Stavish that, owing to the Department of State termination, Railhead had "diverted" $400,000.00 in RCA's purchased receivables to payroll. Docket No. 23-4; RCA Ex. 9.[2]

9.      Mr. Butler advised Mr. Stavish that, upon receipt of payment from the Department of State, Railhead would repay the $400,000.00 to RCA. *Id.*

---

[1] RCA's Exhibits will be referred to as "RCA Ex. __." The Debtor's Exhibits will be referred to as "DR Ex. __."
[2] Payments on Railhead's contracts were made from the prime contractors to Railhead, and then Railhead would remit payment to RCA's account, as opposed to the prime contractors making payment directly to RCA.

10. Mr. Butler testified that, although this amount had been diverted to pay payroll, it had been repaid well before the bankruptcy was filed. RCA did not offer any testimony to rebut Mr. Butler's testimony on this issue.

11. As of the filing of this bankruptcy case, RCA was owed $1,235,515.24 in unpaid invoices. RCA Ex. 28, Ex. G; Docket No. 23, ¶ 4.

B. *The Cash Collateral Orders.*

12. Railhead filed a Voluntary Petition under Chapter 11 with this Court on March 2, 2026. Docket No. 1.

13. The Debtor filed a Motion to Approve Retention of its Existing Bank Accounts, which the Court granted. Docket Nos. 11, 32. The Order granting the Motion required that the Debtor "shall transfer the full balance of any deposits of contract income to the debtor in possession accounts within three (3) business days of receipt." *Id.*, p.1.

14. There have been three Interim Cash Collateral Orders in the case. Docket Nos. 44, 45, 72.

15. The Second Interim Cash Collateral Order was entered after Railhead negotiated terms with RCA. It required Railhead to make adequate protection payments to RCA in the amount of $250.00 per week. Docket No. 45, ¶ 2.

16. The Second Interim Cash Collateral Order also granted "adequate protection" or replacement liens to RCA on Railhead's receivable with the Department of State and on Railhead's claims against Quadranet, despite the fact that RCA never purchased these receivables. *Id.*, ¶¶ 5,6.

17. RCA asserts that Railhead has been out of compliance with the Second Interim Cash Collateral Order from the start. Specifically, RCA asserts:

- RCA asserts that Railhead has greatly exceeded the Budget attached to the Interim Cash Collateral Order. Specifically, the Budget called for

approximately $241,573.00 in expenditures for the month of March, and Railhead's Monthly Operating Report indicates that it incurred $481,855.00.

- Section 2 of the Order required that Railhead pay $250.00 per week to RCA, "with the first such payment due on the first day of the Budget Period, and weekly thereafter." RCA asserts that Railhead defaulted in the payment of these adequate protection payments. RCA asserted that Railhead was three weeks behind, including the date of the hearing, May 18th. Mr. Butler's explanation for why these payments had not been made was unconvincing. At first, Mr. Butler said that he had no intention of making the payment (acknowledging that Railhead was behind one week and that a second week was due that day, May 18th). Then, after a break, he testified that Railhead would make the payment later that day.

- Section 8 requires that Railhead provide to RCA "all remittance information" on RCA's purchased receivables. Railhead did not dispute that it did not provide all of the information, but Mr. Butler blamed the failure on Railhead's inability to get treasury services for its new Debtor in Possession ("DiP") bank account, at Citizens Bank.

- Section 8 also requires that Railhead provide RCA with "true and complete copies of the invoices delivered by the Debtor to the applicable account debtors with respect to the Purchased Receivables." Mr. Butler testified that this was impossible—there are no such invoices. Railhead submits time spreadsheets to the prime contractors, which then approve the time. Railhead then generates invoices internally for audit purposes only.[3]

18.      The Third Interim Cash Collateral Order was entered after New Tek entered its appearance in the case, and objected to the $250.00 per week adequate protection payments to RCA and to the granting of the replacement liens. Docket No. 72.

C. *The March Monthly Operating Report.*

19.      As noted above, Railhead's Monthly Operating Report for the month of March indicates disbursements of $481,855.00. Docket No. 56, p. 2.

20.      Mr. Butler testified that this was prepared on an accrual basis, not on a cash basis.[4]

21.      The March MOR shows a net profit of $12,801.00 for the month. *Id.*, p. 2.

---

[3] This is why the Court requires debtor representatives to attend all court hearings in Chapter 11 cases. Inevitably some negotiation will take place, and the client needs to be there to ensure that that the attorneys do not agree to something that cannot be delivered.

[4] Even if it is on an accrual basis— that is, the expenses were incurred but remained unpaid—the amounts are still owed, and are substantially in excess of the Cash Collateral Budget.

4

22.     Railhead has had an inordinate amount of trouble opening a Debtor in Possession bank account that meets its business needs. It was still using at least one Bank of America bank account (the **** 7319 account) during the month of March that is not accounted for in the March MOR.

23.     Additionally, Railhead has been using PayPal and PEX to pay its bills. Although the PayPal transactions are reflected in the bank statements, it is impossible to tell from the bank statements precisely who is being paid.

D. *The Amended March Monthly Operating Report.*

24.     On  May 21, 2026, the Debtor filed an Amended March MOR. Docket No. 73. This time, the Amended MOR used a Cash Basis. *Id.*, p. 1.

25.     The Amended MOR shows $307,189.00 in disbursements, still substantially in excess of the budgeted $241,5743.00. *Id.*, p. 2.

26.     The Amended MOR shows $12,801.00 in net profit for March, the same number as was reported under the accrual basis March MOR. *Id.,* p. 2.[5]

E. *The April Monthly Operating Report.*

27.     On May 21, 2026, Railhead filed its second MOR, for the month of April 2026. Docket No. 74.

28.     The April MOR uses a Cash Basis for its accounting. *Id.*, p. 1.

29.     The April MOR shows a net profit of $28,803.00 for the month. *Id.*, p. 2.[6]

---

[5]  The Court does not understand how the March MOR and the Amended March MOR, using two different methods of accounting (accrual versus cash) can result in precisely the same number for net profit for that month.

[6]  Oddly, while the March, Amended March and April MOR's all show positive net cash flow, the Reports all use "zeros" for all of the Cumulative numbers.

*F.  The Allegation of Improper Post-petition Insider Loans.*

30.    Mr. Butler testified at the meeting of creditors in this case that he loaned "about $5,000.00" to Railhead in the first few weeks of the case, to purchase needed equipment. Hr'g. Tr. 4/2/2026, p. 18.

31.    He testified in this hearing that this was not correct, and that he did not loan the company money. Rather, he charged approximately $3,000.00 (not $5,000.00) on his credit card to purchase equipment.

32.    He further testified that this was not a loan, and he did not expect repayment from Railhead.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

Bankruptcy Code Section 1104(a) provides as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1), (2).

The appointment of a Chapter 11 Trustee is an extraordinary remedy that should be granted sparingly. *In re Bergeron*, 2013 WL 5874571, 2013 Bankr. LEXIS 4556* (Bankr. E.D.N.C. 2013);

6

*In re Taub*, 427 B.R. 208, 225 (Bankr. E.D.N.Y. 2010). Appointment of a Trustee should be the

"exception, rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225–26 (3d Cir. 1989).

Appointing a Trustee can be disruptive to the debtor's business, and expensive. The Trustee almost

certainly will know less about the Debtor's business operations than current management. Still,

there are times when the appointment of a Trustee is in the best interests of the creditors and the

bankruptcy estate, notwithstanding these challenges. The burden of proof to demonstrate that there

is cause for the appointment of a Trustee rests with the movant. *In re Partners in Hope, Inc.*, 662

B.R. 120 (Bankr. D.S.C. 2024).

### I.  Subsection (1)—Cause Including Fraud, Dishonesty or Gross Mismanagement.

The term "including" in Subsection (1) is not limiting. 11 U.S.C. § 102(3). "Implicit in a

finding of incompetence, dishonesty, etc., for purposes of section 1104(a)(1), is whether the

conduct shown rises to a level sufficient to warrant the appointment of a trustee." *In re Rafaei,*

2022 WL 2911429, 2022 Bankr. LEXIS 2031* (Bankr. E.D. Va. 2022), quoting *In re General Oil*

*Distributers, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984).

RCA argues that Railhead committed pre-petition fraud in diverting $400,000.00 of RCA's

purchased receivables. Mr. Butler acknowledged the pre-petition diversion, but testified that the

$400,000.00 was repaid some time ago. RCA did not present any testimony that rebutted Mr.

Butler's testimony. Further, RCA's Proof of Claim in this case (RCA Ex. 26), in the amount of

$1,235,515.24, is the same amount as is stated in RCA's Ex. G in RCA Ex. 28. RCA's Ex. G does

not include the $400,000.00 in its total amount due. The Court, therefore, concludes that Mr.

Butler's testimony on this issue is correct, that the $400,000.00 was repaid in advance of the

bankruptcy filing. The Court does not excuse nor condone the diversion of RCA's purchased

receivables, pre-petition. On the other hand, it does not appear that the diversion of RCA's funds

7

was accomplished in an effort by insiders to loot the company. Rather, the funds were diverted to make payroll (a not-uncommon occurrence with small businesses).

The Court concludes that, although there was a pre-petition diversion in the use of RCA's purchased receivables, this was remedied by the repayment of the $400,000.00 before the bankruptcy filing. On balance, the Court finds that this does not constitute cause for the extraordinary remedy of the appointment of a Chapter 11 Trustee.

## II.    Subsection (2) – The Interests of Creditors, Equity Security Holders, and Others.

"The standard under Section 1104(a)(2) of the Bankruptcy Code is more flexible than those under Section 1104(a)(1) and the determination lies within the sound discretion of the Bankruptcy Court." *In re Rafaei*, 2022 WL 2911429, at *3, 2022 Bankr. LEXIS 2031*, at 8; *In re IPofA West Oaks Mall, LP,* No. 07-33649-KRH, 2007 WL 3223295, at *4, 2007 Bankr. LEXIS 737*, at 13–14 (Bankr. E.D. Va. Oct. 29, 2007). RCA's complaints are varied, and in many cases justified. The Court will address RCA's allegations, below.

*A. Non-Compliance With the Cash Collateral Order.*

RCA asserts that Railhead's non-compliance with the Second Interim Cash Collateral Order justifies the appointment of a Chapter 11 Trustee. The Court is frankly shocked that Railhead, a subprime contractor in the national security field with revenues of over $5 million per year, was unable or unwilling to pay *$250.00 per week* to RCA, the amount to which it agreed in the first Cash Collateral Order.

Mr. Butler acknowledged that Railhead was not in compliance with Section 8 of the Second Interim Cash Collateral Order, in that Railhead failed to provide "all remittance information" to RCA. Mr. Butler blamed this on Railhead's inability to obtain treasury services from Citizens Bank, but it is a default under the Second Interim Cash Collateral Order.

8

Further, Mr. Butler testified that it is impossible for Railhead to comply with the invoices requirement of Section 8. This plainly indicates that Mr. Butler had no idea what was in the Second Interim Cash Collateral Order, and that he had no ability to comply with its requirements.

Railhead has not complied in material respects with the Court's Second Interim Cash Collateral Order.

B. *The First March Monthly Operating Report.*

The first March Monthly Operating Report (MOR) states that there were cash disbursements in the amount of $481,855.00 in that month. RCA Ex. 40, p. 2. Mr. Butler testified that this was based on the accrual method of accounting, not on a cash basis. Even on a cash basis in the Amended March MOR, the Debtor had disbursements of $307,189.00, substantially in excess of the budget number in the Second Cash Collateral Order. Docket No. 73, p. 2.

Page 1 of the MOR form asks whether the Reporting Method is Accrual Basis or Cash Basis. Railhead clicked on the Accrual Basis choice. Part 1, however, uses the term "Cash Receipts and Disbursements." While other parts of the form might appropriately use the accrual method (depreciation, for example), where the form requires a statement of "Cash Receipts and Disbursements," it should be obvious that this is asking for a cash-in and cash-out accounting.

Assuming that the "Cash Receipts and Disbursements" disclosure requirement can be satisfied using the accrual method, the company still incurred, but did not pay, post-petition payables during the month of March that were substantially out of compliance with the requirements of the Second Interim Cash Collateral Order. The Amended MOR for March confirms that the Debtor was substantially over budget on its expenses for that month.

Additionally, it is clear that the **** 7319 bank account at Bank of America was being used post-petition, but was not reflected in the initial March MOR. The Court understands that it

takes some Chapter 11 Debtors some time to get their Debtor in Possession accounts up and running (it appears that it took about 40 days in this case), but this does not excuse the use of a non-DiP bank account and not reflecting that use in the first MOR.

Finally, the Debtor is using PayPal and PEX to pay its vendors on a post-petition basis. There is no per se rule against this, and some debtors might need to use these services (though it is surprising that a business with revenues of over $5 million needs to do so), but there is no way to tell from the March MOR who was being paid.

C.  *The April Monthly Operating Report.*

The April MOR does have a Citizens Bank DiP Account statement attached. Docket No. 74, pp. 48-55. It appears that the DiP Account was opened on April 6, 2026. *Id.* The Order entered on March 19, 2026, required the Debtor to deposit receipts into the DiP Account within three (3) days of receipt. Docket No. 32. The Debtor, therefore, was not in compliance with the Order from March 19th to at least April 6th.

D.  *The Alleged Insider Loan.*

The Court accepts Mr. Butler's testimony that he did not loan $5,000.00 to Railhead, post-petition. Rather, he charged $3,000.00 to his personal credit card for the purchase of equipment, with no expectation of repayment. This is not an example of malfeasance or mismanagement, though obviously, Mr. Butler needs to be more careful when he is testifying under oath.

E.  *The Replacement Liens.*

Finally, and most disturbingly, Railhead agreed to replacement liens in favor of RCA on the State Department receivable and the Quadranet claims. RCA never purchased the State Department Receivable, nor the Quadranet claims. It never had a lien on these receivables (it steadfastly maintains that it is not a secured lender, and is a factor). The rubric under which these

10

liens were granted was Railhead's pre-petition diversion of $400,000.00 in RCA receivables. As the evidence unfolded at the hearing on RCA's Motion to Appoint a Trustee, however, it became clear that the $400,000.00 was repaid months before Railhead filed for Chapter 11. Additionally, it now appears that other parties, M&T and New Tek, may have first and/or second pre-petition liens on these receivables.

Railhead's agreement to these replacement liens was just an effort to placate an active creditor, RCA, without giving any thought to its own capital structure nor to its ability to reorganize in Chapter 11. New Tek has entered its appearance, and it objects to the replacement liens, and to the payment of $250.00 per week from the proceeds of its collateral. Docket Nos. 64 (Objection of Newtek Small Business, LLC to Motion to Authorize Use of Cash Collateral and Request for Adequate Protection and Memorandum in Support Thereof), 72 (Third Interim Cash Collateral Order).

### III.    The Remedy.

Railhead has defaulted on its obligations to RCA and its reporting obligations to the Court in a number of important respects. It defaulted on the $250 per week adequate protection payments requirement. It failed to provide RCA with all of the remittance information it is entitled to under the Second Interim Cash Collateral Order. It now maintains that compliance with the invoices requirement of Section 8 is impossible—meaning, it should never have agreed to this provision in the first place. It's using Pay Pal and PEX to pay its vendors. The first MOR used accrual method accounting where the form plainly required the disclosure of cash in and cash out. Railhead agreed to replacement liens in favor of RCA, which never had a lien on those assets in the first place. Clearly, something must be done.

11

Railhead argues that the appointment of a Chapter 11 Trustee will destroy its business because of the sensitive and classified nature of its contracts with the prime contractors. The Court accepts that proposition. But it does not mean that the Court is powerless when it comes to demonstrated non-compliance with its Orders and mismanagement during the case.

The Court has the power under Bankruptcy Code Section 1112(b) to dismiss this case *sua sponte*. *In re Finney*, 992 F.2d 43, 45 (4th Cir. 1993) ("A bankruptcy court may act under § 1112(b) on the motion of a party in interest or *sua sponte* as 'necessary or appropriate' under § 105(a)"); *In re Mohammed*, 596 B.R. 34, 41 (Bankr. E.D. Va. 2019) ("11 U.S.C. § 105 also grants judges the authority to dismiss a bankruptcy petition sua sponte for lack of good faith, or for one of the "causes" enumerated in 11 U.S.C. § 1112"); *In re Dunes Hotel Associates,* 1997 WL 33344253, at *7, 1997 Bankr. LEXIS 2482*, at 20 (Bankr. D.S.C. 1997) ("Section 105 also provides the Court with discretion to dismiss a Chapter 11 case sua sponte.")[7]

The Court finds that it is in everyone's best interests to dismiss this case and to start over. The Debtor has vastly exceeded its Cash Collateral Budget, whether viewed on an accrual or a

---

[7]   In 1986, the Fourth Circuit held that the "the Second Circuit convincingly demonstrated that Congress actually inserted the party in interest' language into § 1112(b) to avoid the problem of courts acting *sua sponte* to dismiss or convert Chapter 11 proceedings." *In re A-1 Trash Pickup, Inc*., 802 F.2d 774 (4th Cir. 1986), citing *In re Gusam Restaurant*, 737 F.2d 274, 276-77 (2d Cir. 1984). The *A-1 Trash Pickup* case was decided on October 9, 1986. Also in 1986, Congress passed the Bankruptcy Judge, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554 (1986 Act), with an effective date of October 27, 1986. The Act contained Section 203, which amended Section 105(a) of the Code to provide: "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." The Act, therefore, legislatively overruled the result in *Gusam* and A-1 *Trash Pickup*. *See In re Daily Corp.,* 72 B.R. 489 (Bankr. E.D. Pa. 1987); 2 COLLIER ON BANKRUPTCY, ¶ 105.01, at 105–2.1 (15th ed. 1987). In 1997, the Second Circuit held: "A bankruptcy may dismiss a bad faith filing on an interested party's motion or *sua sponte*." *In re C-TC 9th Ave. Partnership*, 113 F.3d 1304 (2d Cir. 1997). Since then, courts in the Second Circuit have been dismissing Chapter 11 cases *sua sponte* for cause. *In re Grasso*, 2025 WL 2827765, at *6, 2025 Bankr. LEXIS 2554*, at 13 (Bankr. N.D. N.Y. 2025) ("The court has "wide discretion" in determining the right remedy… and can dismiss even if the moving party sought only conversion"); *In re State Street Assocs.,, L.P.,* 348 B.R. 627 (Bankr. N.D.N.Y. 2006) ("the Court also has the option of dismissing the case for cause *sua sponte*"); *In re G.A.F. Seelig, Inc*., 2020 WL 1486785, at *6, 2020 Bankr. LEXIS 706*, at 19 (Bankr .E.D.N.Y. 2020) ("the filing of a bankruptcy petition in bad faith is cause for dismissal or conversion, and dismissal may occur in response to a party's request or by the court on its own motion.")

cash basis. Its first MOR is so opaque as to be useless. It did not include the Bank of America ****7319 statements. It is impossible to discern who has been paid through PayPal. The Debtor agreed to terms in the Second Cash Collateral Order that even Mr. Butler says Railhead could never meet. It agreed to replacement liens that never should have been granted.

The Court finds that the only appropriate remedy, one that serves all of the parties, is to dismiss this case. The case will be dismissed without prejudice, meaning that the Debtor is free to re-file a Chapter 11 case. *See* 11 U.S.C. § 349(a) (unless otherwise indicated, a dismissal is without prejudice). Hopefully, Railhead and its management have learned some lessons in navigating Chapter 11 during the course of this brief but unsuccessful case.

The Court will dismiss this case without prejudice.

### CONCLUSION

It is therefore **ORDERED**:

1.    This case is **DISMISSED without prejudice.**

2.    RCA's Motion to Appoint a Trustee is **DENIED as moot.**

3.    The Clerk will mail copies of this Memorandum Opinion and Order, or will provide CM-ECF notice of the same, to the parties below.

Date:  Jun 29 2026

Alexandria, Virginia

/s/ Brian F Kenney

HONORABLE BRIAN F. KENNEY
CHIEF U.S. BANKRUPTCY JUDGE

Entered On Docket: Jun 30 2026

Copies to:

Railhead, Inc.
510 Spring St., Suite 270
Herndon, VA 20170
*Chapter 11 Debtor*

Jeffery T. Martin, Jr., Esquire
8065 Leesburg Pike, Suite 750
Vienna, VA 22182
*Counsel for Debtor*

13

Jason Butler
510 Spring St., Suite 270
Herndon, VA 20170
*Debtor Designee*

Thomas J. McKee, Jr.
1750 Tysons Blvd.
#1000
McLean, VA 22102
*Counsel for Republic Capital Access, LLC*

Katharine Toledo, Esquire
1725 Duke Street
Suite 650
Alexandria, VA 22314
*Counsel for the U.S. Trustee*